## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| NANCY AKINS, | ) | CASE NO. 1:25-CV-01353-CEH |
| | ) | |
| Plaintiff, | ) | JUDGE CARMEN E. HENDERSON |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| v. | ) | |
| | ) | MEMORANDUM OPINION AND |
| COMMISSIONER OF SOCIAL SECURITY | ) | ORDER |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | ) | |

**I. Introduction**

Nancy Akins ("Akins" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (ECF No. 8). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's final decision denying Akins benefits.

**II. Procedural History**

On January 24, 2023, Akins filed applications for DIB and SSI, alleging a disability onset date of September 24, 2022. (ECF No. 9, PageID #: 245). The applications were denied initially and upon reconsideration, and Akins requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On June 12, 2024, an ALJ held a hearing, during which Claimant, represented by counsel, and an impartial vocational expert testified. (*See id.* at PageID #: 267-83). On June 25, 2024, the ALJ issued a written decision finding Akins was not disabled. (*Id.* at PageID #: 245-

61).  The ALJ's decision became final on April 30, 2025, when the Appeals Council declined further review.  (*Id.* at PageID #: 29).

On June 28, 2025, Akins filed her Complaint to challenge the Commissioner's final decision.  (ECF No. 1).  The parties have completed briefing in this case. (ECF Nos. 10, 12).  Akins asserts the following assignments of error:

> (1) Whether the ALJ's assessment of the opinion evidence improperly cherry-picks isolated facts to discount supported medical findings.
>
> (2) Whether the ALJ failed to build a logical bridge between the evidence and her assessment of Ms. Akins' residual functional capacity, resulting in an under-assessment of limitations.
>
> (3) Whether the ALJ erred by assigning the same RFC despite worsening medical evidence and the prior ALJ's findings.

(ECF No. 10 at 1).

## III. Background

### A.  Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Akins's hearing:

> At the time of application, the claimant stated that the following conditions limited her ability to work: panic attacks; post-traumatic stress disorder; anxiety; scoliosis; arthritis in the back; myalgia; narrowing of the bilateral C3-C4 through C5-C6; asthma; neuropathy; and high blood pressure (B3E/2). At the hearing, the claimant testified that she is unable to work due to pain. She has numbness and tingling of her feet. She has muscle spasms of both middle toes. Her feet are "burning" after about 10 minutes of standing or walking and sitting too long causes pain. Her ankles hurt "real bad" and the pain shoots up her legs into her lower back. She also has pain of the neck and shoulders. On an average day, her pain is at 7-8/10 with medication. Her balance is "off," and she had had a few falls. The claimant further testified that she can only sit for about 15 minutes before having to stand or change positions; she can only stand for about 10 to 15 minutes before resting or changing positions; she can only walk for about 5 to 10 minutes before needing a break; and lift about 10 pounds. Her sleep is "not

2

very good." She has three to four nights per week where her sleep is "bad" and she is groggy, sleepy, and tired the next day. She has anxiety when she is around a lot of people or it can come out of nowhere. She has depression daily. On a typical day, she is "mostly" at home, in her room, and in bed watching television. She lives with her teenage daughter who does most of the household chores. The claimant does the grocery shopping but her teenage daughter or older son bring the groceries in for her. Her children help her "a lot."

(ECF No. 9, PageID #: 251-52).

**B. Relevant Medical Evidence**

The ALJ also summarized Akins's health records and symptoms:

In terms of the claimant's alleged physical limitations, mental limitations, and symptoms including pain, fatigue, and periods of poor concentration, a review of the record shows that on October 12, 2022, the claimant returned to see nurse practitioner Ursula Jackson at the Cleveland Clinic. On examination, the claimant was alert and cooperative. Her mood, attention, thought content, cognition, memory, and judgment were normal. The physical examination was normal. For mild intermittent asthma, Ms. Jackson continued the claimant's Albuterol inhaler and nebulizer (B2F/12-15).

On January 16, 2023, the claimant saw physician assistant Melanie Queener at Cleveland Clinic's Neurology Department with a chief complaint of paresthesias. The claimant noted that she was originally referred for headaches, but these had improved, and she wanted to discuss her paresthesias. The claimant explained that she had had many years of numbness and tingling in her lower extremities. She noted pain since June 2022, down the back of the leg along with numbness and tingling. She stated that this was "manageable," but had worsened over the last six months. She denied any injuries or accidents to elicit this. She stated that she had symptoms when she stood for prolonged periods of time, noting that she stood on her feet "much of the day." The claimant denied weakness and she had had no falls. The claimant's medications included Voltaren gel and Flexeril "as needed" for muscle spasms. On examination, the claimant was alert and well appearing. Her gait and coordination were normal. There was 5/5 (normal) strength of all extremities. There was diffuse and equal hyporeflexia, but without any weakness. There was decreased vibratory sensation on the left with decrease in pin prick and

temperature on the left. Ms. Queener ordered x-rays of the claimant's lumbar and cervical spine. Ms. Queener prescribed physical therapy and she asked the claimant to return in three months (B2F/6-8).

On January 16, 2023, x-rays of the claimant's lumbar spine showed degenerative changes (B2F/48-49) and on January 16, 2023, x-rays of the claimant's cervical spine showed degenerative changes with narrowing of the bilateral C3-C4 through C5-C6 neural foramina (B2F/51-52).

On April 18, 2023, the claimant saw Caroline Just, MD, at Cleveland Clinic's Neurology Department. The claimant reported neuropathic symptoms of shooting pain into both legs, burning and tingling pain in both feet, worse with standing. She felt her legs were weak as well getting shooting pain down her left leg. She also described burning pain at her neck shooting down into the left arm into the medial hand. The claimant had never tried any neuropathic pain agents and never had an EMG. She reported that she was starting physical therapy tomorrow as ordered by physician assistant Melanie Queener. On examination, the claimant was alert and she followed simple and complex commands. The claimant's gait and coordination were normal. The claimant had good strength throughout. The sensory examination showed pin prick sensation was normal in the lower extremities and patchy reduced in the upper extremities. Dr. Just ordered an MRI of the cervical spine to look for nerve compression and an EMG. Dr. Just prescribed Nortriptyline, a neuropathic pain agent, and physical therapy (B5F/16-22).

On April 19, 2023, the claimant started a short course of outpatient physical therapy. Physical therapist Nicholas Sohl recommended one visit per week for 10 weeks (B5F/11-16).

On May 4, 2023, the claimant returned to see Ms. Jackson for a wellness examination. The claimant reported that she was doing generally well. On examination, the claimant was alert and cooperative. Her mood, attention, thought content, cognition, memory, and judgment were normal. The physical examination was normal including normal pulmonary effort; normal breath sounds; normal range of motion; full passive range of motion of the cervical spine without pain; and no pain with movement, spinous process tenderness, or muscular tenderness. For mild intermittent asthma, Ms. Jackson continued the claimant's Albuterol inhaler and nebulizer solution. For chronic pain of both ankles, she prescribed Ibuprofen. Since the claimant had essential

4

hypertension, Ms. Jackson recommended regular aerobic exercise (B5F/7-11).

On May 31, 2023, an MRI of the claimant's cervical spine showed cervical spondylosis with varying degrees of mild-moderate foraminal stenosis, most significant at C3-4 on the left, and C4-5 and T2-3 on the right, and no high-grade canal compromise (B5F/39-41).

On June 14, 2023, the claimant attended a psychological consultative examination conducted by Jorethia Chuck, PhD, with a chief complaint of anxiety. The claimant stated that she had "anxiety all the time." The claimant had no significant behavioral health history. The claimant reported that she was taking psychiatric medication (Sertraline and another medication but she could not remember the name of it) prescribed by her primary care provider. The claimant stated she was currently working for Sweet Home care as a Home Health Aide. Her job duties included assisting clients with daily living like cooking, cleaning, and running errands. She was currently working three days per week, three to four hours per day, and she had been working "off and on" for fifteen years. She reported getting along with her clients and getting along with her supervisor. On examination, the claimant was dressed in neat and casual clothing. She was pleasant and cooperative and answered the questions asked of her. She did not appear distracted by internal stimuli during the interview. She did not exhibit any bizarre behavior. She gave good eye contact. Her speech was intelligible and her voice was clear. She displayed good expressive and receptive language skills. She was goal directed with no evidence of delusions, hallucinations, or paranoia. Her affect was anxious and her mood appeared anxious. The claimant endorsed symptoms of anxiety and noted her anxiety had gotten worse. She did not exhibit any shaking of the hands or trembling hands or legs during the interview. In terms of sensorium and cognitive functioning, the claimant was oriented to person, place, and time. She knew the colors of the American Flag were red, white, and blue. In terms of attention and concentration, she did not appear to lose concentration. In terms of recent and remote memory skills, she recited 3 objects immediately, and could recite 0 of the 3 objects after five minutes. She could recite 6 digits forward and 3 digits backward. Her cognitive functioning was estimated to be in the average range based on education, presentation, and work history. Her general fund of information appeared to be consistent with her cognitive functioning. When asked what the saying "The ball is in your court" means she said, "It's your turn." She demonstrated good insight and judgment. Dr.

5

Chuck diagnosed the claimant with generalized anxiety disorder (B6F).

Regarding the four work-related mental abilities, Dr. Chuck expressed the following medical opinion: (1) in understanding, remembering, and carrying out instructions, the claimant's cognitive functioning is estimated to be in the average range. The claimant's presentation is consistent with a diagnosis of anxiety which impacts her ability to function daily. She would have problems carrying out complex instructions; (2) in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks, given the claimant's anxiety, she would find it difficult to maintain attention and concentration. She would have difficulty carrying out tasks that require her maintain persistence and pace; (3) in responding appropriately to supervision and to coworkers in a work setting, the claimant reported getting along with her clients and with her supervisor. She appeared to try to present with social conformity during the interview, she should be able to respond appropriately to supervision; and (4) in responding appropriately to work pressures in a work setting, the claimant's mental ability to withstand the stresses and pressures associated with day-to-day work activities is assessed as having impairment. Given the claimant's mental state, her adjustment levels are likely to deteriorate under the pressures of a normal work setting (B6F/6-7).

…

On July 28, 2023, the claimant called the Cleveland Clinic for the recent results of the MRI of her cervical spine and the EMG. Dr. Just's nurse told the claimant, per Dr. Just, that her EMG did not show any signs of motor nerve damage. There was reduced sensation in her feet that could still be from some more "minor sensory advantage" in her spine, and there was no evidence of neuropathy which was "good news." Regarding her neck MRI, it showed some narrowing of the nerve canal on the left as well as the right, but it did not show anything that would require surgical intervention. Dr. Just instructed the claimant to continue with her current pain medication and physical therapy (B7F5-6).

On September 8, 2023, the claimant consulted with Moayad Alabdulkarim, MD, of the Cleveland Clinic's Center of Spine Health, regarding her back pain and left lower extremity symptoms. The claimant was no longer taking Pamelor (Nortriptyline) because she could not tolerate it. The claimant had attended only two physical therapy sessions which helped, but she

had to schedule for further sessions. On examination, the claimant was alert and pleasant. There was no evidence of cognitive or language dysfunction. The examination of the claimant's lumbar spine and hips showed no erythema, no swelling, and spinal alignment was grossly normal. There was no tenderness to palpation over the paraspinal muscles, SI joints, gluteal musculature, or greater trochanter. There was normal, unrestricted range of motion with flexion, extension, side-bending, and rotation. Hip range of motion was full without pain with internal and external rotation. There was 5/5 (normal) strength. Dr. Alabdulkarim diagnosed radiculopathy of the lumbar region. Dr. Alabdulkarim recommended that the claimant continue with physical therapy and applying heat or ice intermittently. Dr. Alabdulkarim recommended medications such as Medrol Pack, Gabapentin, and Acetaminophen. They also discussed interlaminar cervical epidural injections (B10F/6-13).

On December 7, 2023, the claimant saw rheumatologist Elisheva Weinberger, DO, at MetroHealth, with complaints of pain in multiple joints for years. The claimant was taking Tylenol and Gabapentin. The claimant had recently been prescribed Cymbalta for pain and anxiety, but the claimant had not started Cymbalta yet. On examination, the claimant was alert and comfortable and her mood was normal. The detailed joint examination was normal (including full range of motion without pain and no swelling, warmth, or tenderness) for all joints except for full range of motion of the hips, but with pain with flexion and internal and external rotation on the left localized to the groin. Dr. Weinberger diagnosed chronic low back pain and chronic pain in multiple joints due to osteoarthritis. Dr. Weinberger agreed with Cymbalta and added Lidoderm patches (B14F/6-10).

On May 2, 2024, the claimant returned to Dr. Weinberger. The claimant stated that she was taking Ibuprofen "as needed" and Gabapentin and using Lidocaine patches. She said she took Cymbalta for two months but stopped it because it was not helping her anxiety. On examination, the claimant was alert and comfortable and her mood was normal. The detailed joint examination was normal (including full range of motion without pain and no swelling, warmth, or tenderness) for all joints except for full range of motion of the hips, but with pain with flexion and internal and external rotation on the left localized to the groin. Dr. Weinberger still agreed with the claimant taking Cymbalta (B23F/11-21).

(ECF No. 9, PageID #: 252-56).

IV.    **The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2027.

2.  The claimant has not engaged in substantial gainful activity since September 24, 2022, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.  The claimant has the following severe impairments: degenerative changes of the lumbar spine; degenerative changes of the cervical spine with narrowing of the bilateral C3-C4 through C5-C6 neural foramina; cervical spondylosis with varying degrees of mild-moderate foraminal stenosis, most significant at C3-4 on the left, and C4-5 and T2-3 on the right, and no high-grade canal compromise; large fiber neuropathy; asthma; generalized anxiety disorder; and post-traumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; stand or walk about 6 hours maximum of an 8-hour workday and sit for 6 hours; never climb ladders, ropes, or scaffolds; occasionally perform all remaining postural activities; avoid work tasks that require frequent exposure to respiratory irritants and all exposure to work in unprotected heights and no commercial driving; there are no memory limits and no limits in interacting with others; and she can maintain concentration, persistence, and pace for two hour blocks of time with normal breaks for work duties that do not require hourly production quotas.

    …

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant

8

numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 24, 2022, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(ECF No. 9, PageID #: 248, 251, 260-61).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-

insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Akins raises three issues on appeal: (1) whether the ALJ's assessment of the opinion evidence improperly cherry-picks isolated facts to discount supported medical findings; (2) whether the ALJ failed to build a logical bridge between the evidence and her assessment of Ms. Akins' residual functional capacity, resulting in an under-assessment of limitations; and (3) whether the ALJ erred by assigning the same RFC despite worsening medical evidence and the prior ALJ's findings.  (ECF No. 10 at 10.

### 1. Opinion Evidence

Akins first argues the ALJ "committed reversible error by presuming that doing limited activities of daily-living meant that Ms. Akins could perform a wife [sic] range of substantial

gainful activity" and that "[b]y cherry-picking Ms. Akin's [sic] part-time work and her limited daily activities to discount consistent medical opinions, the ALJ improperly rejected the findings of both the consultative examiner and the state agency psychologists."  (ECF No. 10 at 11-12).  Plaintiff argues that contrary to the ALJ's conclusion, "[t]he fact that [she] retains some parental role does not demonstrate sustained functional capacity" and "her ability to work 12 hours per week—well below substantial gainful activity—is consistent with her testimony that she has multiple medical issues, and that she needs to lie down frequently and misses activities due to pain and panic attacks, and thus, cannot sustain competitive employment."  (*Id.* at 13).  Further, Plaintiff argues that while the ALJ dismissed some of the consultative medical examiner's conclusions because "the doctor allegedly used 'vague, imprecise terminology' and over-estimated limitations based on a one-time presentation," "the ALJ did not identify what terms were 'vague,' nor explain why the CE's clinical findings—documented through examination—should be disregarded."  (*Id.*).  Plaintiff raises a similar argument regarding the ALJ's failure to identify vague and undefined findings from the State agency psychologists.  (*Id.* at 14).

The Commissioner responds that "the ALJ properly considered consistency and supportability of the opinion evidence, and the ALJ's persuasiveness findings are supported by substantial evidence," such that the ALJ's decision should be affirmed.  (ECF No. 12 at 8).  Concerning Dr. Chuck's opinion, the Commissioner highlights that the ALJ concluded the opinion was "unsupported by her own examination findings" and "inconsistent with evidence from other sources."  (*Id.* at 9-10).  Further, the Commissioner argues it was permissible for the ALJ to find "the complexity and stressful nature of working as a home health aide and raising a teenage daughter inconsistent with Dr. Chuck's opined limitations."  (*Id.* at 10-11).  As to the State agency psychologists' opinions, the Commissioner argues the ALJ properly considered

supportability and consistency, highlighting the ALJ's indications that the opinions "lacked support and adequate explanation," were vague, and were inconsistent with Plaintiff's limited mental health treatment and activities of daily living.  (*Id.* at 12-13).

At step four, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  Under the current regulations, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 416.920c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  *Id.*  Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 416.920c(c).  The factors include: supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion."  20 C.F.R. § 416.920c(c).  The ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion but generally is not required to discuss other factors. 20 C.F.R. § 416.920c(b)(2).  Under the regulations, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be" and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical findings(s) will be."  20 C.F.R. § 416.920c(c)(1)-(2).

### a.  Consultive Examiner Dr. Jorethia Chuck

On June 14, 2023, Dr. Jorethia Chuck conducted a psychological evaluation of Akins.

(ECF No. 9, PageID #: 813-19).  Dr. Chuck concluded Akins suffered from general anxiety disorder and would have problems carrying out complex instructions, as well as difficulty maintaining attention and concentration or carrying out tasks that require her to maintain persistence and pace.  (*Id.* at PageID #: 816-17).  Additionally, Dr. Chuck concluded Akins' ability to withstand the stresses and pressures associated with day-to-day work activities was impaired and her adjustment levels were likely to deteriorate under the pressures of a normal work setting.  (*Id.* at PageID #: 818).

After summarizing Dr. Chuck's opinion, the ALJ provided the following explanation regarding her consideration of the opinion:

> Overall, Dr. Chuck's medical opinion is not fully persuasive because she used vague and imprecise terminology, did not properly quantify limits, and over-estimated limits based on a one-time presentation when other evidence supports more functional abilities. Part (1) of Dr. Chuck's opinion (that is, the claimant would have problems carrying out complex instructions) is not persuasive because it is not supported by her finding that the claimant's cognitive functioning is estimated to be in the "average range." Dr. Chuck noted that the claimant's presentation was consistent with a diagnosis of anxiety which "impacts her ability to function daily." However, this is not consistent with the claimant raising her teenage daughter; the claimant's ability to work as a Home Health Aide, albeit on a part-time basis, with job duties including assisting clients with daily living like cooking, cleaning, and running errands; and the limited course of mental health treatment (that is, simply taking psychiatric medication prescribed by her primary care provider). Furthermore, on April 18, 2023, Dr. Just, the claimant's neurologist, noted that the claimant "followed simple and complex commands" (see above). Part (2) of Dr. Chuck's opinion is not persuasive because it is not supported by her own findings that the claimant answered the questions asked of her (B6F/4) and she did not appear to lose concentration (B6F/5). Part (3) of Dr. Chuck's opinion is persuasive because she supported it with an adequate explanation. Part (4) of Dr. Chuck's opinion (that is, given the claimant's mental state, her adjustment levels are likely to deteriorate under the pressures of a "normal" work setting) is not fully persuasive because she did not support it with an adequate explanation. Furthermore, Part (4) of Dr. Chuck's

> opinion is not fully consistent with the claimant raising her teenage
> daughter; the claimant's ability to work as a Home Health Aide,
> albeit on a part-time basis, with job duties including assisting
> clients with daily living like cooking, cleaning, and running
> errands; and the limited course of mental health treatment (that is,
> simply taking psychiatric medication prescribed by her primary
> care provider).

(ECF No. 9, PageID #: 254-55).

This detailed discussion illustrates that the ALJ appropriately considered the supportability and consistency factors. As to supportability, the ALJ explained that Dr. Chuck's opinion was not supported by her own findings that Akins had average cognitive functioning and was able to answer questions asked of her and did not lose concentration, and the opinion lacked adequate explanation as to why Akins' adjustment levels would deteriorate under the pressure of a normal work setting. (*Id.* at PageID #: 254; *see id.* at PageID #: 815-18). Turning to consistency, the ALJ highlighted Plaintiff's ability to care for her teenage daughter and work on a part-time basis; her limited mental health treatment; and other records indicating Plaintiff's ability to follow simple and complex commands. (*Id.* at PageID #: 254-55; *see id.* at PageID #: 767). Thus, the ALJ adequately explained her consideration of the supportability and consistency factors in analyzing Dr. Chuck's opinion and substantial evidence supports the ALJ's decision.

### b.  State Agency Psychologists

The ALJ also considered the opinions of the State agency psychologists, providing the following summary of the opinions and explanation of her treatment of them:

> Sylvia Chen, PhD, and Kari Kennedy, PsyD, reviewed the
> claimant's case file at the request of the State agency, the Division
> of Disability Determination Services, on July 13, 2023 and
> November 14, 2023, respectively. As mentioned at Finding #4, the
> State agency psychological consultants' findings about the
> "paragraph B" criteria (Exhibits B4A, B5A, B6A, and B9A) are

14

persuasive because they are supported by the record, with one exception. In terms of the one exception, the undersigned finds the claimant has a "mild" limitation in understanding, remembering, or applying information, as opposed to their finding of "moderate," for the reasons already outlined at Finding #4. Furthermore, on April 18, 2023, Dr. Just, the claimant's neurologist, noted that the claimant "followed simple and complex commands" (see above). On December 6, 2023, Ms. Manto noted that the claimant's mood was sad, but the claimant was well groomed and appropriately dressed; her memory was intact; her thought process was logical, coherent, and rational; and her fund of knowledge was appropriate and adequate (see above).

Both consultants expressed the following medical findings: despite functional limitations associated with the established psychological medically determinable impairments, the claimant retains the ability, on a sustained basis, to understand, remember, and carry out both simple and detailed instructions and make work-related decisions, but would not be able to manage complex instructions or sustain attention and concentration for longer than what is required in a typical eight-hour workday. The claimant can interact appropriately with coworkers, supervisors, and the public, but due to difficulty regulating emotions on a sustained basis, the claimant would function best in familiar, predictable settings that have no significant changes in task expectations or require high production rate or pace (B4A, B5A, B6A, and B9A).

These medical findings are not persuasive. Their finding that the claimant "would not be able to manage complex instructions" is not persuasive because of the lack of support and adequate explanation for stating the claimant could not manage complex instructions. Their finding that the claimant "would not be able to manage complex instructions or sustain attention and concentration for longer than what is required in a typical eight-hour workday" is not persuasive because it is vague and improper. Their finding that "the claimant would function best in familiar, predictable settings that have no significant changes in task expectations or require high production rate or pace" is not persuasive because of their use of undefined terms. In addition, a residual functional capacity is the most the claimant can do, not the least despite her limitations or restrictions. Furthermore, their findings are not consistent with the limited course of mental health treatment, the claimant's ability to raise her teenage daughter, or her ability to work as a home health aide albeit on a part-time basis. Instead, the undersigned finds the claimant has no memory limits and no limits in interacting with others. The claimant can maintain concentration,

15

> persistence, and pace for two-hour blocks of time with normal breaks for work duties that do not require hourly production quotas.

(ECF No. 9, PageID #: 258-59).

Once again, the ALJ's explanation illustrates that she adequately considered the supportability and consistency factors in finding the State agency opinions unpersuasive. As to supportability, the ALJ indicated the opinions lacked support and adequate explanation; were vague and improper; and relied on undefined terms. (*Id.* at PageID #: 259). While Plaintiff argues further explanation was required, the Court can adequately follow the ALJ's reasoning. For example, the ALJ rejected the opinion that Akins "would not be able to manage complex instructions or sustain attention and concentration *for longer than what is required in a typical eight-hour workday*" because it was "vague and improper." (*Id.* (emphasis added)). It is unclear whether the emphasized time limitation applied to both Akins' ability to manage complex instructions and sustain concentration, or to only one of these limitations. Further, it is unclear why Plaintiff's ability to maintain attention and concentration for *longer* than a typical workday would support a finding of limitations during a workday, especially given that, as the ALJ observed, "a residual functional capacity is the most the claimant can do, not the least despite her limitations and restrictions." (*Id.*). Turning to consistency, similar to Dr. Chuck's opinion, the ALJ found that the opinions were inconsistent with Akins' "limited course of mental health treatment, the claimant's ability to raise her teenage daughter, or her ability to work as a home health aide albeit on a part-time basis." (*Id.*).

Overall, the ALJ's consideration of the medical opinions was consistent with the regulations and supported by substantial evidence.

### c. Medical Judgments

After addressing the medical opinions, Plaintiff argues that "[b]y rejecting consistent medical opinions in favor of isolated notations about childcare and part-time work, the ALJ substituted her lay interpretation for medical judgment and failed to follow the governing regulations." (ECF No. 10 at 14). Plaintiff relies on *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006), where the Sixth Circuit observed that an ALJ "may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." In *Meece*, the ALJ discounted the plaintiff's pain allegations based on a doctor's failure to prescribe certain prescriptions, but the Sixth Circuit found the decision regarding what medications were appropriate was "beyond the expertise of the ALJ" and was therefore not a legitimate basis to reject the plaintiff's pain allegations. 192 F. App'x at 465. Here, however, the ALJ did not substitute her own opinion but rather found that the record did not provide support for the medical opinions and, as discussed above, this conclusion is supported by substantial evidence.

### 2. Logical Bridge to the RFC

Plaintiff next argues that "[d]espite extensive medical imagining, neurological examinations, and psychological evaluations documenting significant limitations, the ALJ nevertheless concluded that Ms. Akins could perform light work without appropriately explaining how the evidence supported that result." (ECF No. 10 at 15). Plaintiff's position is that her testimony and the objective medical evidence supported greater limitations due to her physical impairments and the ALJ failed to build a logical bridge explaining why the additional limitations were not included in the RFC. (*Id.* at 15-16).

The Commissioner argues the ALJ relied on the State agency medical consultants'

17

opinions in finding that Plaintiff was capable of a range of light work such that "the ALJ explained the basis for her RFC finding, and her RFC is supported by substantial evidence." (ECF No. 12 at 14).  The Commissioner asserts that "the ALJ found [Plaintiff's] testimony inconsistent with imagining showing mild to moderate problems, a normal EMG, some normal physical examinations, and treatment consisting of medications and therapy, i.e., conservative treatment" and these "are adequate reasons for doubting a claimant's subjective complaints." (*Id.*).

The Court finds the Commissioner's arguments persuasive.  The ALJ provided a detailed explanation for finding that Akins' physical impairments were not as severe as alleged:

> The undersigned finds that the objective medical evidence, including the signs and laboratory findings, and the course of treatment in this case are not consistent with disabling physical impairment or disabling pain and are more consistent with the stated residual functional capacity. Regarding the objective medical evidence, on January 16, 2023, x-rays of the claimant's lumbar spine showed degenerative changes (B2F/48-49). On January 16, 2023, x-rays of the claimant's cervical spine showed degenerative changes with narrowing of the bilateral C3-C4 through C5- C6 neural foramina (B2F/51-52). On May 31, 2023, an MRI of the claimant's cervical spine showed cervical spondylosis with varying degrees of "mild-moderate" foraminal stenosis, most significant at C3-4 on the left, and C4-5 and T2-3 on the right, and no high-grade canal compromise (B5F/39-41). On May 4, 2023, x-rays of the claimant's ankles and hands showed no evidence of acute osseous pathology (B4F/11-13). As recounted above, an EMG did not show any signs of motor nerve damage, there was reduced sensation in her feet that could still be from some more "minor sensory advantage" in her spine, and there was no evidence of neuropathy which was "good news." As recounted above, some of the physical examinations of the claimant are normal or unremarkable. While some of the physical examinations of the claimant show hyporeflexia, decreased sensation, and/or pain with range of motion of the hips, the claimant's gait is normal and she has good strength throughout (see above). On examinations, there are no findings indicative of tiredness or fatigue. Regarding course of treatment, for pain including neuropathic pain, the claimant has been prescribed medications

such as Voltaren gel, Nortriptyline, Ibuprofen, Tylenol, Gabapentin, and/or Lidoderm patches (see above). She has been prescribed Flexeril "as needed" for muscle spasms (see above). On April 19, 2023, the claimant started a short course of outpatient physical therapy. Physical therapist Nicholas Sohl recommended one visit per week for 10 weeks (B5F/11-16), and although the claimant said that physical therapy helped, she did not complete her course of physical therapy (see above). Notably, as mentioned above, Ms. Jackson, the claimant's primary care provider, recommended "regular aerobic exercise" for the claimant (see above and see B16F/16), not spending most of the day in bed watching television. The claimant testified that her balance is "off," and she had had a few falls. Regarding falls, on August 25, 2023, the claimant presented at the Emergency Department with a chief complaint of left shoulder pain after falling about one week ago. The claimant explained that she was walking down the stairs when she "mis-stepped" causing her to start to slide down the stairs. She reached out for the banister with her left arm and believed her arm was strained in the process. She denied hitting her head, head injury or trauma, and loss of consciousness. She denied any numbness, tingling, or altered sensation of the extremity. X-rays of the left shoulder showed no fracture or dislocation. The claimant was discharged from the Emergency Department with small prescriptions for Flexeril, Lidoderm patch, and Prednisone (B14F/10-15). On March 9, 2024, the claimant presented at the Emergency Department for back pain after falling on March 5, 2024. The claimant explained that she was walking when her knee twisted and she fell, striking her back. Since then, she had been having persistent back pain. The claimant reported persistent tingling of the legs which was mildly worse than usual, but this had been a chronic issue for her. The claimant's CT imaging showed no evidence of traumatic injuries. The claimant was neurovascularly intact distally other than some baseline neuropathy. Dr. Powers noted that the claimant would likely do well on an outpatient basis with follow up with the Spine Center. The claimant reported feeling safe with this plan so the claimant was discharged to home with a prescription for Flexeril "as needed" (B21F/5-8). While the claimant has sustained two falls, fortunately without serious injury, the first fall occurred when she "mis-stepped" on stairs and the second fall occurred when her knee twisted while walking. From this, the undersigned does not find that the claimant's balance is "off." While the claimant has received medical care on a regular basis, she has not required or received frequent care for any medically determinable physical impairment. From all of this, the undersigned finds that the claimant's symptoms and limitations are not as severe as alleged.

(ECF No. 9, PageID #: 256-57).

This discussion provides sufficient explanation for the RFC the ALJ ultimately adopted. For instance, the ALJ recognized that imagining showed degenerative changes in Plaintiff's spine but no evidence of acute osseous pathology in her ankles and hands and there were no signs of nerve damage on an EMG. (*Id.* at PageID #: 256; *see id.* at PageID #: 623, 625-26, 662-64, 786-88, 825). The ALJ also relied on normal or unremarkable exams; Akins' normal gait and good strength; and the lack of "findings indicative of tiredness or fatigue." (*Id.* at PageID #: 256; *id.* at PageID #: 582-84, 587, 755-56, 768, 867, 1105-06). Additionally, the ALJ cited the fact that Plaintiff had "not required or received frequent care for any medically determinable physical impairment." (*Id.* at PageID #: 257). While Plaintiff argues the evidence supported greater limitations—largely based on her own subjective complaints—the ALJ provided an adequate explanation for the RFC she adopted, and substantial evidence supports her decision. Thus, contrary to Plaintiff's argument, the ALJ built an accurate and logical bridge between the evidence and the RFC.

### 3. Adoption of Same RFC

Finally, Plaintiff argues that despite her medical conditions worsening since a prior 2014 decision, the ALJ here adopted the same RFC, which was an error warranting remand. (ECF No. 10 at 17). Plaintiff asserts that "the ALJ assigned the same 'light' RFC – without explanation of how greater impairments and reduced functioning still justified the same capacity" and "[t]his failure to reconcile past findings with updated and significant material evidence showing deterioration, violates the requirement to evaluate the longitudinal record and to explain evidence." (*Id.* at 18).

The Commissioner responds that "while the ALJ was required to consider the prior—

20

2014—ALJ decision, the ALJ was under no duty to explain why her decision was consistent—or inconsistent—with the prior ALJ decision."  (ECF No. 12 at 15).

The ALJ acknowledged the prior decision's RFC, providing the following summary:

> Of note, in the prior ALJ decision dated June 13, 2014, Judge Giuffre identified the following severe impairments: spine disorders. Judge Giuffre identified the following non-severe impairments: asthma and anxiety. Judge Giuffre provided for the following residual functional capacity: performing light work as defined in 20 CFR 416.967(b) except the claimant could occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. The claimant could occasionally stoop, kneel, crouch, and crawl (B1A).

(ECF No. 9, PageID #: 257-58).  However, the current ALJ explicitly indicated that she did not adopt the prior RFC finding because there had been changes to the listings and there was new and material evidence establishing a significant change in Plaintiff's condition.  (*Id.* at PageID #: 245).

Contrary to Plaintiff's argument, the ALJ here did not adopt the same RFC as the prior ALJ.  Under the regulations, light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 416.967(b).  Additionally, "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm controls."  *Id.*  By adopting an RFC for light work and only limiting Plaintiff's climbing, stooping, kneeling, crouching, and crawling, the prior ALJ implicitly concluded Plaintiff could perform the full range of lifting, carrying, walking, and standing associated with this range of work.

In the current decision, however, the ALJ did not conclude that Plaintiff could perform a full range of light work but rather imposed additional limitations not imposed by the prior ALJ. The ALJ explicitly limited Plaintiff's standing or walking to 6 hours and sitting to 6 hours, and

provided that she should avoid tasks that require frequent exposure to irritants and all exposure to work in unprotected heights with no commercial driving.  (ECF No. 9, PageID #: 251). Additionally, the ALJ found that Plaintiff could maintain concentration, persistence, and pace for two-hour blocks of time with normal breaks for work duties that do not require hourly production quotas.  (*Id.*).  The ALJ's discussion of the prior decision, her explicit finding that there had been a change in the regulations and there was new material evidence, and the imposition of additional limitations not included in the prior RFC illustrate that the ALJ did not adopt the prior RFC.  Further, as discussed above, the ALJ provided sufficient explanation for the RFC ultimately adopted.  Therefore, the Court finds no error in the ALJ's decision.

**VI. Conclusion**

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying Akins benefits.


Dated: January 7, 2026


s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE